The first case we're going to hear this morning is Grey v. Jaddou and Mr. Banias. We're going to hear from you first. Mr. Banias is with us remotely because of circumstances that we've agreed with, and so we'll hear him on television, so to speak, and then we'll hear from you here in court. All right, Mr. Banias. Thank you, Your Honors, and good morning, and may it please the court. My name is Brad Banias. I represent Mr. Grey in this case, and thank you again. I would rather be joining you guys in Richmond, but I appreciate the accommodation, truly. Thank you. This court should reverse the lower court decision for various reasons. The most important reason is that Mr. Grey is entitled to become a U.S. citizen. He became a permanent resident lawfully. He's gone through the process more rigorous than most applicants to prove by a preponderance of the evidence that he meets the eligibility criteria and that he's a person of good moral character. And for these reasons, this court should reverse the lower court, send it back for a trial de novo on the application in front of Judge Norton. This case does present varying issues because it was both a Freedom of Information Act case as well as a naturalization delay case that turned into a naturalization merits case, and I will, of course, answer whatever question the court would like, but I'll start with the naturalization issues. I think this rounds into two issues. The first is whether the district court, the order not excluding unproduced information was right. We would say that order is wrong and should be set aside. Discovery in this case started in October. Do you agree that the district court, by rule 37, was given the discretion to impose the sanction that it thought was appropriate in the circumstances? Your Honor, I do think the rule allows it. I think in this situation, that was an abuse of discretion because the agency provided zero reason why it waited nearly a year after, I think we did six depositions, ample amount of discovery to not ever produce this and simply attach it to its motion for summary judgment. The rule is very clear. When that happens, when they don't provide it in an appropriate time, you can't use it. Period. It would seem to me that the district court was faced with a little more complex situation because it was a progressive circumstance. I mean, the deposition gave rise to further investigation, and the court recognized that it was untimely, and the court did impose a sanction of costs, shifted costs for all the discovery so as to relieve you of it. And on the other hand, the court favored getting to the merits and not throwing cases out on technicalities, which is of course a wonderful policy as a general matter. Your Honor, I would say this, is that the litigation position that the deposition somehow made this relevant is nothing more than a litigation position. The agency was aware of this in 2016. When I deposed the actual adjudicator, he said, yeah, this is not an issue, this is not a problem, this is not a reason we would stop naturalization. The reality on the ground is for the first two years of this case, the government claimed it was a marriage fraud case. Then when that fell apart because there was zero merit to claiming a 12-year marriage was fake, they came up with whatever they could. They somehow got a hold of records that were expunged under South Carolina law. I have no idea still to this day how they actually acquired those documents. Under the state law, it was pretty clear explicitly that law enforcement is an exception. Well, Your Honor, I don't think that's what the law says, but we can disagree on that. Judge Norton certainly did. But they should have produced it a year before. They had it. If they had it, they could have had it. There's no reason to hide that from Mr. Gray during his deposition. And again, going to the merits of that, Your Honor. Would that have changed the result if they produced it a year before? Yes, Your Honor. Would he have been honest about it? Your Honor, he never lied. That's the first thing. It's a question of fact. Well, that's a pretty bold statement. I've read the actual transcripts and I've read what he said to the police. And he confessed that he lied and he explained that he was afraid and scared. I don't think that's an issue. Your Honor, I agree. I don't think his representations to the police in 2016 are an issue either. The agency now claims, again, after three years of claiming it was a marriage fraud case, they instead find a new way to besmirch my client. And they claim that the language, the two different things, representations in 2016 to the Beaufort County Police somehow were for the immigration benefit. That can't be true. Beaufort County Police do not have authority to do anything related to immigration or naturalization. And, again, the adjudicator who was going to decide this case knew all about that and said it would not preclude naturalization. So the agency changed its mind when it got put in a bad spot in litigation. When it comes to the deposition testimony, you also have to see an intent here. There is no language in that deposition transcript with the Assistant United States Attorney that would indicate, A, that he was actually contradicting things he said in 2016. Why did he say he lied because he was afraid? That was in 2016 in front of the Beaufort County Police. Fair enough, but the relief was denied on two grounds. Moral turpitude involved in lying to the police and in lying on deposition. And, again, Your Honor, I think lying to the police simply doesn't qualify under the regulation that requires it to be false testimony under oath. Nothing in front of the Beaufort County Police was under oath for the intent to obtain a benefit under the Immigration and Nationality Act. A Mirandized statement in 2016 in front of local police simply does not meet the requirement that it's intended to get naturalization. Well, I thought there that was a crime. Wasn't it a crime, misprison, a felony? It was, Your Honor. So the test is a crime of moral turpitude. Your Honor, I think there's two different reasons. There's false testimony and then there's the unlawful acts. No, the false testimony was the deposition, but the statute, what does the statute say? Crime of moral turpitude, right? No, Your Honor. It's good moral character when it comes to naturalization. Good moral character, all right. And good moral character, I would suggest, is an intensely fact-based issue. So the intent behind his slow, incomplete testimony he gave to the police is relevant here, and that's a question of fact. As you noted, Judge Niemeyer, he said he didn't give the full testimony because he was scared, and he was scared of retaliation in his community. That has nothing to do with trying to say that. No, I brought that up only because you said he didn't intend, and it looks like he clearly did intend. He admitted he intended in order to avoid, he was afraid. He knew he was not telling the truth. And, Your Honor, I would also say that the unlawful acts regulation says unlawful acts that adversely reflect upon the applicant's moral character. That's a question of fact. If he did not give a complete story because he was scared and thought that he might be next, that's relevant to this analysis. And Judge Norton didn't give us an opportunity to have Judge Hershey. Do you think it's a justification to lie because you're afraid? Your Honor, your characterization of it as a lie is nowhere in the record, and it's, he provided. Well, how about the deposition testimony? I've read the deposition testimony, and I thought that it was quite inaccurate. Your Honor, I think that if you actually compare what the government claims he lied about now, again, the AUSA did not confront him or show him the testimony in February 2016 because it didn't have it or it didn't provide it. It was trying to hide it from us. I don't know. That goes back to the initial issue of them playing games and making us go through a year and a half of discovery only to come up with a new ground at the last minute. But no, the government claims that he said he did not see the shooting. If you go back and look in 2016, he says he heard the shot. He never saw the shooting. So that's not a misrepresentation. It said he didn't talk to Haynes. That was the victim afterwards. And he said he didn't talk to Haynes. He got in the car and left. Then he said he didn't see the conflict. He said he never heard the argument. The testimony is consistent. I would also note that deposition was done via video during the heart of COVID, and there were a lot of problems with it. And so what the AUSA got no evidence on the record about if that was a representation, why he would make making that misrepresentation without that claim of intent. There is no there is a question of fact here. Judge Norton needs to sit him down, go through the deposition and go, what were you saying here? That's that's the key here. This isn't just you say something the government perceives as wrong now. He said the first thing I saw was the victim on the ground and I never saw the shooter. The first thing I saw is the victim on the ground just can't be reconciled with the truth. Are you you're saying the deposition testimony can't be reconciled with February 2016 recording? Yeah, or the yeah, or the February 29th. The prior two interviews can't be reconciled with either of the previous two statements. I think you have to look at the question the assistant United States attorney asked and not just take it out of context because the AUSA did not ask the same questions that were asked of him in February 2016. And again, this still goes to the intent. There is no evidence in the deposition of his intent. Are you do you when you say that are you say are you do you mean intent to gain an immigration benefit? Correct. So isn't it his burden to prove he doesn't have the intent? No, not at this point, your honor. If they want to claim that this is false testimony, they have to prove that it is false testimony for the purpose of obtaining an immigration. But I thought he had to prove that he had the good moral character. I thought the burden is on him. He does, your honor. But this is essentially an affirmative defense of the government. This is why they want to deny it. What's the evidence? What's the evidence that this deposition in a naturalization case in an attempt to gain citizenship was not intended to gain an immigration benefit? What's the evidence? The answers to the AUSA were to do that answer the questions of the AUSA. The AUSA does not have the ability to make a decision on naturalization. The judge does at this point. And so any testimony, that would be like saying anything he's done in his entire life is to obtain an immigration benefit. Because he has to have continuous presence in the United States. It simply can't go that far. What was the point of the deposition? You'll have to ask the government for that, your honor. What did Appellant think the point of the deposition was? To determine whether his marriage was a sham. To determine whether his marriage was a sham would determine whether or not he got citizenship, correct? That's correct, your honor. So it was important for him to be truthful in that deposition. And he was, your honor. How can you say he was? I mean, he says the first thing you see, he saw a person lying on the ground. Did you see two guys? I only saw one guy. I mean, the one guy that got shot. This is his testimony, page I say 149. How do you square that? I understand, your honor. He confesses that when he tells the whole story, it's just a totally different story. Your honor, there's still no evidence of the intent, period. And that's going to be our ground. He says, I came upon this scene and I see a guy lying down and there's only one guy there. You think that that isn't a deliberate when in fact he saw both guys there and he knew them and he was within a few feet of the shooting when it happened? Your honor, saying that he sees someone on the ground is incomplete, I agree. But it's not a contradiction. He says, I only, use the word only. No, this is his answer. I only saw the one guy. Now, isn't that exclusive? I don't have it in front of me, your honor. I'm not going to disagree with your reading of it, your honor. It's a fool's error. The one guy that got shot, they only saw him at the time. And earlier you said it depended on what the question was that was asked. And the question was, you said there were two employees of yours. Did you see them both? Answer, no. I only saw the one guy. That's the full context. The question doesn't ask when he saw them and at what time. And I believe the question is before that, the deposition context is, what were you telling him? If you read the prior page, he said he came to the scene, he was going to the boat, and he saw the one guy on the ground. So the timing, he puts the timing in exactly what he intended to say. And basically he wanted to distance himself from this whole thing and not have any knowledge. He knew exactly who did the killing, didn't he? Your honor, I would also suggest that this goes to good moral character. I believe it's also good moral character for someone to see that and go and try to save his employee. To put his hands and try to stop the bleeding and to call the police. And that should be weighed too. That was completely excluded and not allowed to go in front of the judge, the fact finder. This is a balancing game. This isn't a gotcha game under the regulations. That's what the agency wants you to believe. This is naturalization. Actually, this is a case about whether he failed to tell the truth in deposition under oath or whether he failed to tell the police originally the truth. Your honor, this case was about marriage fraud for three years until the government realized that its investigation tactics are completely pop science. You know, we have a lot of cases where people go, police officers go and are investigating maybe drugs or something and they look on a computer and they see child pornography. And so at that point, they prosecute on child pornography. I mean, I don't understand where that gets you. Your honor, this is not a criminal investigation. This is not an enforcement procedure. No, I'm talking about the notion you're suggesting that because it starts out one way and the person lies during it, that lie cannot be used in terms of the immigration decision. Your honor, I would point you to 8 U.S.C. 1421C, which is the statute that goes forward for a naturalization proceeding that indicates that this should be based on a record. It talks about the Administrative Procedure Act. So no, I do not believe this is an analog to a criminal investigation that you just described. My analog is shifting positions doesn't gain you much. In other words, it started out as an investigation of a sham marriage. And during the course of that investigation, they discover something else. It seems to me they could rely on that something else if that was material. Your honor, I think that's why we did the Freedom of Information Act portion of the case. And I see I'm out of time, so I'll let my colleagues speak. Why don't you cover that on your rebuttal? You have some rebuttal here. We'll get you back on rebuttals. Hang in. Thank you. And you can see the court. Can you see the court and the lawyers? Yes, your honor. The setup is very nice. All right. We'll hear from Mr. McConnell-Santana. Thank you, your honor, and may it please the court. My name is Victor Mercado-Santana for the United States. There are two main issues before the court, the first being whether the appellant, Mr. Gray, is eligible to naturalize in spite of him having provided false testimony, false statement to the police involving the shooting of a co-worker and in his deposition. And second, regarding the FOIA claims, and this court should affirm both sets of decisions. First of all, with regards to the naturalization claim, it is clear that Mr. Gray lacked the moral character for both reasons. One, because he provided false testimony under oath at his deposition for naturalization, for the purpose of obtaining naturalization. And because his actions before, like his statements to the police, demonstrate unlawful acts that adversely reflect on his moral character. So first, with regards to the false statements, I mean his statements are clear, like his statements at the deposition were clearly false. And they demonstrate an intent to obtain an immigration benefit. First of all, those statements were not provided to a doctor for medical treatment or a psychologist or to the press. They were provided at his naturalization proceedings that he initiated in order to obtain naturalization. So it is very clear in the context that his intent was to obtain an immigration benefit. And opposing counsel, during his presentation, was talking about how the case was originally about marriage fraud. Well, no, the case is and has always been about his eligibility to naturalize. At his deposition, it might have happened late in the discovery process. It might have been the last thing that happened around, I believe it was around August of 2020. And at that point, he provided the false statements under oath. And at that point, this new line of inquiry that did not exist before came about. In other words, I mean, in other words- He argues that that statement to the police back then was not under oath. The statements to the police were not under oath. Well, the first statement to the police was not under oath. But the statement at his deposition, the one that happened near the close of discovery, was under oath. Which is why it is a statement that we can consider for the false statement prompt. Because the false statement prompt needs to be a false statement under oath and for the purpose of obtaining an immigration benefit. And that's what occurred at the time of his deposition. And with regards to the unlawful acts element, I mean, for this one, we don't look at- Our focus is not the deposition testimony. For this one, the focus is the statements that were given to the police originally. And in that case, it is providing false statements to the police. It was an unlawful act. It adversely reflects on his moral character because it is lying and refusing to cooperate to police officers, especially in the murder, in the shooting death of a co-worker. It just doesn't reflect on the character of people in the community. And with regards to extenuating circumstances, there are- I mean, none can be proven in this case. It is his burden to demonstrate that there are extenuating circumstances. Well, the opposing counsel says that the fact that he attempted to render aid to the person who was shot should have been taken into account. What's your response to that? Well, that doesn't address the fact that he provided false statements- that he provided statements to the police officers that he later admitted they were fact. I mean, I think it is commendable that he provided aid, but- I think he was saying it wasn't considered at all, and it should have been, in his view. Well, it- well, the- whether a crime adverse- whether something adverse is reflected, whether there are extenuating circumstances, have to relate to the actual crime that is at issue. I think it is- I mean, I think it is a- I mean, it is a positive thing that he provided aid to the best of his ability, but that still doesn't- I'm sorry. That still doesn't negate or extenuate the fact that when the police was investigating this crime, he provided false statements to them. And because of those two reasons- for those two separate reasons, Mr. Gray simply did not lack good moral character for the purpose of naturalization. And second, with regards to the issue regarding the sanctions against the government, there is simply no abuse of discretion in the district court order. While the government disagrees with the district court's order, we're not appealing the sanctions. We understand that the government has to make the requisite payment. But, I mean, as the rule provides, the exclusionary sanction is not a mandatory sanction. It can be- there can be alternate sanctions that can be tailored for the purpose of the case. And in this case, the reopening to permit discovery was a reasonable sanction. I mean, given that- given that his deposition happened pretty late in the process, he provided the false statements that brought to light new issues that needed further inquiry, and that the district court noted that was important to look at because in a naturalization case, the individual has to meet every single requirement for naturalization and it would not have served public policy to allow him to pursue naturalization when there is this entire question of whether he was ineligible because of lack of good moral character. And lastly, with regards to the FOIA claim, there's a dispute regarding the FOIA records, some FOIA records that were produced that were training materials to agency officers as to how to investigate merit fraud cases. Those records are- I mean, they're- they document techniques and procedures for investigations and prosecutions and they're used to train officers on merit fraud, provide guidance on how to enforce immigration law regarding merit fraud. And as such, they were properly exempt from disclosure under 7E of FOIA. This appellant has stated that because the- because he has stated that CIS is not a traditional law enforcement agency, that does not mean that CIS is not allowed to enjoy this exemption or claim this exemption, I'm sorry. Because you don't need to be a traditional law enforcement- you don't need to be the FBI or any other traditional agency that comes like with guns and like in other agencies. Like we normally think of law enforcement. CIS is enforcing immigration law, and as such, those trainings are exempt from disclosure. And lastly, with regards to the- This is not a question. My Vaughn index in the JA is missing pages 886 to 991. I didn't see it in the electronic JA or the printed one. The district court cut out some documents within that range, so it appears mildly relevant. You don't have to answer anything right now, but if you can go back and look and see if those pages happen to be missing and if they are, supplement them for us after argument. That would be great. And if nothing is missing, you determine that I'm somehow missing something, just send us a letter and let us know. But I didn't see in my Vaughn index, Bates page 886 to 991. And that would be in the June appendix, right? Pardon? That's from the June appendix. Yes, that's right. Thank you. Any further? I mean, if the court would like to hear about the disclosure of the issue regarding sealing the documents, the documents that were inadvertently disclosed, I mean, that was a clerical error, but it doesn't mean that the agency waived its claims to have those documents not be exempt. So the court did not err in entering a protective order nor did it abuse the discretion in sealing those documents. So unless the court has any other questions, we ask the court to confirm the disclosure. Thank you. All right, Mr. Banias. Thank you, Your Honors. Let's be very clear. The full FOIA production is available to the public. It's been filed in two different cases in the District of South Carolina. It is in possession, the full thing, of a reporter and a nonprofit owner who does reporting on immigration. And that was all done prior to the government claiming that they accidentally did this. I would also point, there's no evidence in the record. I thought they produced it redacted first and then they produced the version that had the missing redactions. No, Your Honor. The FOIA case here was a little convoluted, but they filed the entirety of the production in the district court and most of it was, well, a lot of it was unredacted. And again, they don't claim that I had a requirement to turn it over immediately because in today's discovery, you see this all the time. Boxes that are potentially marked for redaction and then someone makes a choice, no, we're not going to redact that. They don't go back and delete the box. Is this argument about sealing and protective orders, isn't all that moot? I mean, the district court decided you're not entitled to this because of FOIA, so that's what is driving the decision. I mean, how could we grant you any relief now aside from deciding the FOIA question? Yes, Your Honor. I do think that from our position, it's the other way around. The judge entered a seal order and a protective order so that he could make the decision on the FOIA. But the fact is all of this is publicly available. It's with a reporter. It's still on the docket. So the protective order and the seal are protecting nothing, and that would render the FOIA decision moot. And I would suggest that at the time the judge made the protective order and the seal decision, the cat was already out of the bag. The bell was already rung. And the protective order does not require any non-parties to go and get those materials or take them down from ECF elsewhere. It's publicly available. And the only thing that happened was I had to delete my copies, which I did. But the reporter is not required to. The information, anyone can go download it right now. And so I would suggest the protective order is protecting nothing. The seal order is ineffective. I thought it was replaced on the docket with the sealed version. These were taken down, and now the docket just has the sealed version. You're not allowed to have it. The court withdrew them from anyone within its reach. In this case, that's true, Your Honor. You can't download it here. There are two other cases, one called Boyce in the District of South Carolina, one called Parcha in the Eastern District of Texas, where those materials were relevant and they were put on the docket. And those are still available. And, again, I was not ordered to demand them back from a reporter. So the first, there's no compelling interest to have a seal order that seals nothing. And there's no interest in the protective order because the government failed to show any steps it would have taken to prevent such a clerical error. And you have to have evidence of that. They have to go on record, under oath, and explain what happened. There's a perfunctory affidavit or declaration that was attached to a reply, and I would suggest that's not enough. When it comes to the FOIA claim, our claim is not that everything USCIS touches cannot be law enforcement. However, I will note, it is undisputed. The immigration adjudicator admitted when I asked him, are you a law enforcement officer, he said, absolutely not. And in a declaration, USCIS referred to FDNS or fraud detection, quote, officers as, quote, non-law enforcement officers. But the real question here is, why was this data compiled? Was this data compiled in the course of an investigation that was done to detect or punish a violation? This wasn't even done in the context of enforcement proceedings. This is just PowerPoint, and if you look through the record, it will tell you why they did it. They did it to train. This has nothing to do with the investigation or detection or punishment of violations of law. Simply because an adjudicator matches up eligibility criteria with the law and they engage with the law does not mean they are, quote, law enforcement, as FOIA defines that term. Law enforcement is for the FBI. It is for the CIA. And maybe, maybe it's for CIS where they come across information and they're developing an investigation to go revoke something or pass it on to ICE. None of that is here. And for that reason, this protective order protects nothing, the seal order seals nothing, and the FOIA decision should be reversed. Thank you, Your Honors. And, again, I really do appreciate the accommodation. Thank you, Mr. Banias. I think you've made your arguments well in that circumstance. It's always nicer to be in the courtroom, but I hope everything works out for you. Thank you, Your Honor. I do appreciate it. We customarily come down to court and greet counsel, and so our expression of appreciation for your arguments, your well-thought-out arguments, has to be our handshake with you today on a virtual basis. And we'll come down and greet Mr. Ricardo Santana at this moment. Thank you, Your Honors.
judges: Paul V. Niemeyer, Stephanie D. Thacker, Allison J. Rushing